**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

|  |  |
|---|---|
| Resorts World Las Vegas LLC, <br><br> Plaintiff/Counterdefendant <br><br> v. <br><br> Rock Fuel Media, Inc., <br><br> Defendant/Counterclaimant | Case No.: 2:21-cv-02218-JAD-MDC <br><br> **Order Granting Motion for Summary Judgment and Granting in Part Motion to Exclude Expert Opinion** <br><br> [ECF Nos. 128, 132] <br><br> *\*\*sealed information redacted\*\** |

In 2018, Rock Fuel Media pitched its concept for a sports-gaming platform called "VSports Live" to Resorts World Las Vegas LLC during the development stage of Resorts World's casino and resort on the Las Vegas Strip.  Resorts World didn't end up contracting with Rock Fuel, and Rock Fuel never built the VSports Live platform.  When Resorts World opened its doors several years later, it instead partnered with third parties to create two apps from which visitors could engage in sports betting, connect to the casino's loyalty program, make dining reservations, engage in cashless gambling, and more.  Rock Fuel, believing that Resorts World cribbed its app ideas from the 2018 presentation, sent Resorts World a demand letter alleging that it misappropriated Rock Fuel's trade secrets.  Resorts World then filed this action for a declaration that it did not infringe on or misappropriate Rock Fuel's intellectual property.  Rock Fuel counterclaims for trade-secret misappropriation, breach of the nondisclosure agreement (NDA) that the parties signed before the 2018 presentation, and unjust enrichment.

Resorts World now moves for summary judgment on Rock Fuel's counterclaims.  It argues that the eight-feature combination of mobile-app functions that Rock Fuel claims as its trade secret isn't a trade secret at all and, even if it was, Rock Fuel has no evidence to show that Resorts World misappropriated it.  It also contends that Rock Fuel can't prove breach of the

NDA because there's no evidence that Resorts World used any of Rock Fuel's concepts or products to create its own apps. And it asserts that the unjust-enrichment claim is preempted by Nevada's trade-secret statute. Rock Fuel generally responds with the assertion that these are all issues for a jury to decide.

In conjunction with its summary-judgment briefing, Resorts World moves to exclude the opinions of Rock Fuel's purported expert witness, James Martin. An intellectual-property lawyer, Martin reviewed Rock Fuel's presentation materials concerning its app concept and "extracted" an eight-element set of features that Rock Fuel now presents as its trade secret. He opines that the combination of features he identified is protectable and was misappropriated by Resorts World. The resort challenges Martin's qualifications and accuses him of conjuring up this trade secret only after examining Resorts World's app and highlighting elements that overlap while ignoring those that don't. It also moves to exclude Martin's misappropriation opinion because it isn't based on any specialized knowledge that would be helpful to a jury. Rock Fuel responds that Martin is qualified and that Resorts World's objections to his opinions are better addressed through vigorous cross examination, not outright exclusion.

I grant Resorts World summary judgment on Rock Fuel's trade-secret counterclaim. Resorts World has shown that there is insufficient evidence for any reasonable jury to conclude that Rock Fuel's 2018 presentation contained a protectable trade secret. And even if Rock Fuel's combination was a trade secret, it has not shown that Resorts World misappropriated it. In making this determination, I grant in part Resorts World's motion to exclude Martin's misappropriation opinion because it is not based on specialized expertise that would assist the jury on this issue. Rock Fuel is left with only the fact that some—but not all—of Resorts World's app functions overlap with broad ideas contained in the presentation materials, along

2

with the undisputed fact that some Resorts World employees still had access to those materials when Resorts World rolled out its mobile technology. These facts are not sufficient to create a genuine issue of fact concerning whether Resorts World misappropriated Rock Fuel's alleged trade secret.

I also grant Resorts World summary judgment on Rock Fuel's breach-of-contract counterclaim because Rock Fuel's failure to provide evidence of misappropriation or use dooms that claim, too, and I decline to consider Rock Fuel's alternative breach theory that was raised for the first time at summary judgment. And because Rock Fuel's unjust-enrichment claim is predicated on its trade-secret allegations, it is preempted by Nevada's trade-secret statute. So I grant Resorts World's summary-judgment motion in its entirety, and I order the parties to file a joint status report detailing what remains of this case.

**Background**

**A.      Rock Fuel approaches Resorts World to build out its entertainment venue and programming, ultimately presenting a theater concept and a "sports gaming platform" called VSports Live.**

This case pits Resorts World, one of the newest casino-resort additions to the Las Vegas skyline, against Rock Fuel, a California-based "full-service production company" that "create[s] software platforms and produce[s] innovative technology in the entertainment and music industry."[1] In 2016, when the resort was in early development stages, Rock Fuel's owner and principal Barry Summers reached out to Resorts World's Executive Director of Entertainment Paul Myers "to discuss a potential collaboration."[2] Over the next two years, the pair "engaged in a series of discussions . . . about Rock Fuel potentially building out an entertainment venue and

---

[1] ECF No. 152-3 at ¶ 3 (decl. of Barry Summers).

[2] ECF No. 152 at 6 (citing ECF No. 152-3 at ¶ 4).

3

programming for Resorts World."[3]  In 2017, at Resorts World's request, the parties entered into a non-disclosure agreement (NDA) that broadly defined what constitutes "confidential information" and required the party receiving confidential information to hold it in "strict confidence."[4]  In late 2017, Summers reached back out to Myers to see if a theater-space contract was still available.[5]

In August 2018, Summers inquired about whether Resorts World had selected a "sports wagering company," and Myers responded that it had not.[6]  In September of 2018, Rock Fuel presented its concepts to Resorts World for a multi-use entertainment space called "Izarium" and a "gaming platform" called "VSports Live."  I focus only on the VSports Live presentation materials, as that is the concept that Rock Fuel accuses Resorts World of misappropriating.

Rock Fuel's slide deck characterized VSports Live as "a Sports Betting Platform that connects a venue host and a player to the world of Fantasy Sports, esports, and online video games using cutting edge technology," built with the goal to "give land-based casinos or any sports venue the ability to tap into the multi-billion-dollar online sports gaming opportunity."[7]  Rock Fuel's VSports Live presentation focused primarily on sports-betting functionality,

---

[3] ECF No. 152-3 at ¶ 5; ECF No. 133-5 (January 16, 2017, email from Summers to Myers memorializing a prior meeting "regarding the Resorts World venue buildout/programming").

[4] ECF No. 131-1 ███████████████████████████; ECF No. 152-3 at 2, ¶ 6 (Summers decl., averring that Resorts World "required Rock Fuel to sign" the NDA).

[5] ECF No. 133-7 (emails between Summers and Myers in late 2017/early 2018).

[6] ECF No. 133-8.

[7] ECF No. 133-17 at 7, 9 (VSports Live slide presentation) (cleaned up); *see also* ECF No. 133-18 at 2 (abandoned trademark application for VSports Live, describing it as "a Sports Betting Platform that: connects a venue host and a player to Traditional sports, Fantasy Sports, esports, and other online video games including virtual reality games; enables platers to play online and bet on live sports events at connected Casinos and sports venues; enables real time Multi Player betting; and enables players to instantly connect into a network of live daily fames and programming on a mobile device to play and bet" (cleaned up)).

including a player's ability to download a consumer-facing mobile application via QR code at the casino, place bets from his phone, and cash out his winnings to an in-app digital wallet.[8]

Rock Fuel also contemplated that the app could be used to place sports bets online even when the player was not physically at the casino.[9]  And because the app eliminated the need to stand in line to place bets, Rock Fuel envisioned players using the app to place real-time "spot bets" on events happening in live sporting events.[10]  In Rock Fuel's pitch, the gaming platform would be supported by a "behind-the-scenes" studio based in Los Angeles, California, that would manage the sports-betting components, conduct "real time betting contest[s]," advertise game events, announce winners, and make payouts.[11]

Rock Fuel also presented a "sizzle reel"—a four-minute video highlighting VSports Live's imagined capabilities.[12]  The video focused on the sports-betting aspects of the app but also contemplated virtual-reality games and esports events that would be hosted at the proposed Izarium venue, referring to those events as part of the VSports Live product.[13]  Rock Fuel also put together a "compliance model," proposing eight systems that could comprise the VSports Live platform, customized for Resorts World and named for Resorts World's parent company, Genting:[14]

---

[8] *See generally* ECF No. 133-17.

[9] *Id.*

[10] *Id.*  The presentation gives examples of these real-time spot bets, like "Will there be a touchdown this drive?" with players being able to bet "yes" or "no."  *Id.* at 4.

[11] *Id.* at 11.

[12] *See* ECF No. 133-15 (video presentation manually filed with the court).

[13] *Id.*

[14] *See* ECF No. 1 at ¶¶ 7–8.

1. "Genting Core" was proposed as the "centralized system management" that would consolidate "all technical administrative functionality, consumer-data management, payment processing, and technical-infrastructure management into a single system."[15]

2. "Genting Hub" would be the "consumer-facing web, mobile, and desktop application experience" that would "combin[e] all products into a single location" and would allow Resorts World to "integrate loyalty & reward, social, and payment-processing services throughout the entire user experience."[16]

3. "Genting Rewards" would be a "centralized loyalty and rewards system" that would integrate online and onsite interactions.[17]

4/5. "Genting Sportsbook" would be "the on and off-site mobile sportsbook" that would handle all in-app sports betting, and "Genting ESportsbook" would do the same for esports events and betting.[18]

6. "Genting Live" would be used for spot betting and trivia during live games and would have a 24/7 production headquarters, as well as content-management and production components.[19]

7/8. "Genting Matchmaker" and "Genting Speedrunner" were proposed video-game products that would allow gamers to "wager on the outcome of matches they partake in" and

---

[15] ECF No. 152-2 at 163 ("IZARIUM – VSports Live Compliance Model," attached as an exhibit to Rock Fuel's expert report) (cleaned up).

[16] *Id.* (cleaned up).

[17] *Id.* at 164.

[18] *Id.* at 164–65 (cleaned up).

[19] *Id.* at 166.

include "prop-bet style wagering" in which "[u]sers will have the opportunity to complete tasks faster or get higher scores than their opponents" to win rewards."[20]

After Rock Fuel's presentation, Myers emailed the Rock Fuel team and expressed a continued interest "in the VSports module" but said that Resorts World would "like to set it aside for the moment" while focusing on Rock Fuel's ability to develop a plan for only "the production show aspect" of its presentation.[21]

**B.      Resorts World doesn't contract with Rock Fuel, instead hiring JoinGo and IGT to provide hotel and sports-betting apps.**

In January 2019, Resorts World issued a request for proposal (RFP) for "mobile application development" that would "integrate with 3rd party systems" like:



[22]

After a delay due to the COVID-19 pandemic, Resorts World selected JoinGo to develop that mobile app in the fall of  2020.[23]  JoinGo was selected primarily because it ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[20] *Id.* at 166–67.

[21] ECF No. 152-1 (emails between Myers and Rock Fuel employees).

[22] ECF No. 139-6 at 7 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

[23] *See* ECF No. 140-1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.



[24] [25]

[26] "Over a period of about six months, Resorts World personnel worked with JoinGo personnel to implement the features Resorts World selected."[27] Resorts World employees involved in the project have maintained that they did not consult Rock Fuel's VSports Live materials when working with JoinGo to create the app.[28]

Resorts World also purchased a sports-betting app solution from gaming company IGT "just before the property opened, in early 2021."[29] IGT's product was an "off-the-shelf" or

[24] *Id.*

[25] ECF No. 140-2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

[26] ECF No. 140-3 at 6–8 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

[27] ECF No. 133-2 at ¶ 8 (decl. of Richard Hutchins, Senior Vice President of Casino Operations at Resorts World).

[28] ECF No. 137-1 at 4 (Resorts World's response to Rock Fuel's interrogatory seeking information about the creation of the mobile app, stating that "Resorts World personnel did not consult the VSports Live presentation or materials when working with JoinGo to create the app"); ECF No. 137-2 at 4–6 (60:19–65:16) (Hutchins depo., in which Hutchins confirms that he didn't speak to any of the individuals present at the Rock Fuel presentation about app technology or capabilities and that no one spoke with him about Rock Fuel or VSports Live). The parties filed compressed versions of the deposition transcripts attached to their summary-judgment briefing, so four deposition pages are contained in one ECF page. When citing to those documents I first cite the ECF pagination, and then cite the deposition pages and lines in parentheses.

[29] ECF No. 132 at 24–25 (citing ECF No. 137-2 at 3 (30:20–22) (Hutchins depo. in which Hutchins confirms that Resorts World signed the app deal with IGT in "February of 2021")).

8

"white label" solution that Resorts World could not modify, except to customize the "marketing skin" (i.e., the logo and colors) on the app.[30]

Resorts World's IGT and JoinGo apps were released to the public around June 2021 when the property opened.[31]  The "off-the-shelf" IGT app gave casino-goers the ability to bet on traditional sports games, but not esports, video games, or skill-based casino games.[32]  The JoinGo app integrated with Resorts World's casino-management system SYNKROS.[33]  It could not remotely verify a user's identity, instead requiring that a user visit an on-site kiosk to do so.[34] It integrated a pre-paid debit account from tech company Sightline Payments[35] that allowed players to use the Resorts World app to play slot and table games, but it could not be used for sports betting.[36]  And while the debit account could be added to a separate mobile-payment solution (like Apple Pay), it could not be used to make non-gaming purchases through the app.[37] If a player wanted to cash out, he had to do so in person at the casino.[38]

---

[30] ECF No. 137-2 at 3 (30:23–32:2); ECF No. 139-2 at 4 (30:6–9) (IGT testimony confirming that Resorts World could make "only cosmetic" customizations to the IGT sports-betting app).

[31] ECF No. 133-2 at ¶ 10.

[32] *Id.* at ¶¶ 26–27.

[33] *Id.* at ¶ 6.

[34] *Id.* at ¶ 15.

[35] Sightline Payments purchased JoinGo at around the same time that Resorts World opened. *See id.* at ¶ 17.

[36] *Id.* at ¶ 26.

[37] *Id.* at ¶ 29.

[38] *Id.* at ¶ 36.

**C.    Rock Fuel serves a demand letter alleging that Resorts World misappropriated its trade secret and violated the parties' NDA, and Resorts World responds with this declaratory-relief action.**

In November 2021, Rock Fuel served Resorts World with a demand letter and draft complaint alleging that Resorts World misappropriated Rock Fuel's intellectual property and trade secrets.[39]  Those documents referred to the entirety of Rock Fuel's "proposal and presentation" as trade secrets under Nevada law.[40]  They also referred to VSports Live as a "sports book/pub concept" that offered "casino mobile app-based wagering for real-time sports, fantasy sports, virtual sports, online slots, casino slots, and esports through a guest's virtual wallet" and "an integrated end-to-end mobile app with sports, slot wagering, virtual sports, and casino rewards."[41]

The parties were unable to informally resolve their dispute, so Resorts World filed this declaratory-relief action in December 2021.[42]  A few months later, Rock Fuel filed counterclaims for breach of the parties' NDA, misappropriation of trade secrets under the Nevada Uniform Trade Secrets Act, and unjust enrichment.[43]  The counterclaim alleges that VSports Live is a combination of the following eight trade-secret features:

1.  The VSports Live App is downloaded onto the user's smart phone or mobile device, including the use of a QR code or by downloading the App from an App store.  VSports Live verifies the user's identity using a government-issued ID and includes other security, which may include passwords, PINs, personal information or biometrics (e.g., thumbprint user identification);

2.  VSports Live connects to the user's financial accounts to fund an electronic wallet by linking to the user's bank accounts, PayPal account, cryptocurrency, or other external financing sources, which functionality enables a cashless

---

[39] ECF No. 133-10 (demand letter and draft complaint).

[40] *See id.* at 20, ¶ 69.

[41] *Id.* at 6 (cleaned up).

[42] ECF No. 1.

[43] ECF No. 11.

10

system for placing bets and making purchases in the casino or on the hotel property. A user is not required to visit a cash station or go to a device with a card reader in order to add or transfer funds to the electronic wallet, nor is it necessary for a user to open a credit account directly with the casino;

3. The VSports Live App allows the user to place bets through the App and without using cash, which may include bets on Sports, esports, Fantasy Sports, Casino Table Games, Slots[,] or Skill-Based Casino Video Games;

4. The VSports Live App allows the user to make point-of-sale purchases, including at restaurants, bars, entertainment simulator rides, on-site venues, shops[,] or other places on the casino or hotel property;

5. VSports Live fully integrates the user's betting, purchases[,] and activities with the casino's loyalty and rewards program without requiring use of a magnetic-stripe card, players card, or entry of user information beyond use of the App;

6. The VSports Live App makes it possible to place real-time bets during live sporting or other events without standing in line, which enables in-game real-time spot Sports betting (e.g., betting on the next shot) and allows convenient 24-hour betting;

7. VSports Live enables a user to "cash out" by transferring funds from the user's electronic wallet to the bank accounts or other financial accounts that are linked to the user's account;

8. VSports Live was built to be fully compliant with Nevada gaming regulations and is forward-looking, and is built to easily enable new features to be introduced as laws and industry regulations allow new technologies, which may include new types of real-time Sports betting, esports betting, Fantasy Sports betting, online betting from outside the casino, skill-based casino video games and [virtual-reality] casino games and other contests that enable a user to win money or prizes. The VSports Live App also includes a social component designed to increase the user's engagement with the casino, which social component may include leaderboards displayed within the App or on video screens in the casino, a chat or messaging component or other social aspects related to live events, tournaments[,] or other contests.[44]

Rock Fuel's expert James Martin created this description after Resorts World opened and released its app offerings.[45] Resorts World moves to exclude Martin's expert testimony,

---

[44] *Id.* at 4, ¶ 31.

[45] *See* ECF No. 152 n.1 (acknowledging that Martin "distilled and organized Rock Fuel's elements of its trade secret"); ECF No. 130-2 at 12–13 (97:23–98:3) (Martin's depo., in which he confirms that he "wrote all of the words that are identified as the claim trade secret").

11

contending that he "concocted these eight elements himself in 2022, in an effort to craft a protectable trade secret for litigation" and that his opinions are legal conclusions or require no special expertise that would assist the jury.[46]  Resorts World also moves for summary judgment on Rock Fuel's claims, arguing that Rock Fuel has not come forward with evidence to show that "the ideas it presented to Resorts World were a trade secret" or that Resorts World misappropriated it.[47]  Rock Fuel opposes both motions,[48] which are fully briefed.

## Discussion

Summary judgment is appropriate when the pleadings and admissible evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[49]  If the moving party does not bear the burden of proof on the dispositive issue at trial, it is not required to produce evidence to negate the opponent's claim—its burden is merely to point out the evidence showing the absence of a genuine material factual issue.[50]  The movant need only defeat one element of a claim to garner summary judgment on it because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[51]  The court must view all facts and draw all inferences in the light most favorable to the nonmoving party.[52]

---

[46] ECF No. 128.

[47] ECF No. 132.

[48] ECF Nos. 148, 152.

[49] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).

[50] *Id.* at 323.

[51] *Id.* at 322.

[52] *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

**A.      Rock Fuel has not presented evidence to rebut Resorts World's showing that it cannot prevail on its trade-secret counterclaim.**[53]

To prevail on a claim under the Nevada Uniform Trade Secrets Act (NUTSA), the claiming party must show "(1) a valuable trade secret, (2) misappropriation of the trade secret through use, disclosure, or nondisclosure of use of the trade secret," and (3) that the misappropriation was wrongful "because it was made in breach of an express or implied contract or by a party with a duty not to disclose."[54]  Nevada Revised Statute (NRS) 600A.030 defines a "trade secret" as information that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other persons who can obtain commercial or economic value from its disclosure or use," and is the subject of reasonable efforts "under the circumstances to maintain its secrecy."[55]

### 1.      Rock Fuel hasn't carried its shifted burden to show that its eight-element combination constitutes a trade secret.

#### a.      Rock Fuel's alleged trade-secret combination didn't exist before this litigation and isn't consistently or sufficiently defined.

Resorts World first contends that Rock Fuel has failed to identify a trade-secret that (1) existed at the time Rock Fuel presented its VSports Live concept in 2018 and (2) has been consistently defined.  A party that "seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing that they exist."[56]  "To prove

---

[53] Rock Fuel generally asserts that the questions of whether VSports Live is a trade secret and whether Resorts World misappropriated it are questions of fact that must be left to a jury.  But summary judgment is appropriate in the absence of genuine disputes of fact, and I find that is the situation here.

[54] *Frantz v. Johnson*, 999 P.2d 351, 358 (Nev. 2000).

[55] Nev. Rev. Stat. § 600A.030(5).

[56] *MAI Sys. Corp. v. Peak Comp., Inc.*, 991 F.2d 511, 522 (9th Cir. 1993).  *MAI Systems Corp.* analyzed California's trade-secrets law, which is virtually identical to Nevada's (with one

13

ownership of a trade secret," a plaintiff must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge to those persons skilled in the trade."[57]  And various courts have looked with skepticism upon plaintiffs who are able to identify their trade secret with particularity only after learning the specific details of the defendant's allegedly misappropriating product.[58]  As one California court put it, "The concern with 'combination trade secrets' is that the compilation must be one that was defined and used in the ordinary course of business and was not created or identified for litigation purposes.  A party cannot gerrymander a combination of its own non-secret information to create a made-for litigation 'compilation' trade secret."[59]

Resorts World argues that the compilation that Rock Fuel alleges is "not remotely evident" from the materials provided to Resorts World during the 2018 presentation.[60]  Those materials primarily pitched integrations with a physical venue; betting on sports, esports, and video games; the implementation of a virtual arcade and virtual-reality experiences; and a "live studio" located in Los Angeles that would create 24/7 live content and spot-bet opportunities.[61]

---

difference that I address infra at n.85), as both states have adopted the Uniform Trade Secrets Act.  I predict that Nevada would adopt the interpretations and requirements that the Ninth Circuit discusses in *MAI*.

[57] *Fortunet, Inc. v. Coronel*, 554 P.3d 210, at *4 (Nev. 2024) (table disposition) (cleaned up) (quoting *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020)). Though Rock Fuel is the defendant and counterclaimant in this action, I associate Rock Fuel with a traditional plaintiff and Resorts World with a traditional defendant when that posture is relevant to this motion.

[58] *See, e.g.*, *JobScience, Inc. v. CVPartners, Inc.*, 2014 U.S. Dist. LEXIS 26371, at *14 (N.D. Cal. Feb. 28, 2014) ("A true trade secret plaintiff ought to be able to identify, up front and with specificity, the particulars of the trade secret without any discovery." (cleaned up)).

[59] *SMC, N. Am. v. SMIC Ams.*, 2008 Cal. Super LEXIS 521, at *9 (Aug. 8, 2008).

[60] ECF No. 158 at 12.

[61] ECF Nos. 133-15, 133-17.

14

Rock Fuel's trade-secret definition strips out all these principal concepts, focusing instead on characteristics barely mentioned in the presentation materials, like the ability to place bets on a casino's table games and slots through the app and using the app to pay at onsite restaurants and shops.

Rock Fuel doesn't truly dispute these points.  It merely states that "the trade secrets identified in Martin's report correspond precisely to the materials Rock Fuel provided in the September 2018 presentation and sought to be protected in the NDA drafted by Resorts World."[62]  But Martin's report doesn't address the dozens of other functionalities that the Rock Fuel presentation spotlighted as part of VSports Live, or why only eight of those myriad features were singled out and bucketed into one trade secret.  In essence, Rock Fuel presented the notion of an everything-but-the-kitchen-sink platform for sports, esports, video-game, and fantasy sports betting that also envisioned integrating with a live venue and connecting with other typical casino programming like loyalty programs, a digital wallet, and onsite amenities.  The trade secret it chose to present in litigation cherry picks only some of the aspects that Resorts World eventually offered to its guests through third-party applications.  I cannot conclude from Rock Fuel's presentation—or from Martin's expert report that excises out the rest of VSports Live's proposed functionalities without explanation—that this eight-element combination Martin has identified was a true trade secret at any point in time.[63]

---

[62] ECF No. 152 at 14 (cleaned up).

[63]  Martin provided two opinions: (1) that Rock Fuel's presentation contained a trade secret, and (2) that Resorts World misappropriated it.  Resorts World moves to exclude both opinions.  I do not reach Resorts World's arguments that Martin is unqualified to opine that a trade secret exists because I find that, even if Martin were qualified to express that opinion, it does not create a genuine issue of fact on the question of whether the eight-element combination he extracted was indeed a trade secret. I address infra at pp. 24–25 Martin's qualifications to provide his separate misappropriation opinion.

What's more, Rock Fuel's characterizations of VSports Live morph throughout its summary-judgment briefing, underscoring how undefined and nebulous this theorized trade secret is. Rock Fuel now—in large part—seems to abandon the specific eight-element combination that it listed in its counterclaim, focusing instead on the notion that VSports Live's uniqueness stemmed from the existence of a "single, centralized system" that "seamlessly" integrated any of the potential functionalities that Resorts World may have wanted to implement across its casino, hotel, and entertainment venue.[64] But that "centralized system" concept is nowhere in its counterclaim. Instead Rock Fuel alleges that the presentation offered the VSports Live Mobile Application, which featured a sports-betting platform, an esports-betting platform, a fantasy-sports-betting platform, a virtual-reality gaming platform, a "Casino Video Gaming Platform" and an "Online Casino Platform," and that "VSports Live comprised of" the eight-element combination reproduced supra.[65] Rock Fuel's counterclaim is devoid of the allegations it offers now—that VSports Live's "orchestrated combination of features" that allowed a user's "digital wallet to be used fluidly while simultaneously capturing and feeding all data back into a

[64] *See* ECF No. 152 at 3 (describing VSports Live as a "customizable platform" with the "flexibility to adapt and integrate any mobile applications"); 4 (arguing that the VSports Live "platform included essential features like a cashless digital wallet, seamless integration with point-of-sale systems for entertainment and dining, user loyalty account connectivity, and live sports betting—all working in concert with a full-scale restaurant and bar"); 17 (describing VSports Live as a "flexible, modular platform architecture, capable of being deployed against multiple interfaces depending on Resorts World property needs"); 17 (accusing Resorts World of ignoring that VSports Live "was going to be designed to be a cohesive and integrated platform—one that combined several functionalities into a centralized platform specifically tailored to Resorts World's" needs); 19 (arguing that VSports Live's "innovation was not simply the proposal of a digital wallet, point-of-sale integration, live-sports betting, or any other component in the abstract. Rather, the objective of [VSports Live] was to integrate all of these functionalities into a single, centralized platform designed to operate seamlessly across the entire Resorts World property."); 21 (describing VSports Live as a "comprehensive and specific platform" and a "well-conceived, detailed platform model designed to unify Resorts World's hotel, casino, and entertainment through a single integrated system").

[65] ECF No. 11 at 4, ¶¶ 29, 31.

16

loyalty and rewards program" is what "made [it] innovative and, more importantly, made it a trade secret."[66]

To the extent that Rock Fuel now claims a "centralized system" as its trade secret, just what that centralized system was meant to contain cannot be pinned down.  Rock Fuel represents that VSports Live was presented as a "comprehensive and specific platform" but also that it was designed to be entirely flexible to suit Resorts World's needs, that it could contain any number of features and functionalities, and it could be "deployed in as many applications as Resorts World chose."[67]  At various points, Rock Fuel highlights VSports Live's ability to integrate with a designated venue, and it calls the ability to "work[] in concert with a full-scale restaurant and bar" one of its central features.[68]  The presentation materials also demonstrate that the focus on esports, video games, and virtual-reality experiences was a centerpiece of Rock Fuel's vision of the VSports Live platform.  Yet, none of these things are in the eight-element combination Rock Fuel identified in its counterclaim, and Rock Fuel doesn't dispute that it did not present or develop any source code, programming, or technical system that would provide more information about the scope of the envisioned product.  At the time, all it showed Resorts World was the slide deck, the sizzle reel, and the "compliance model" containing a laundry list of possible functions and systems VSports Live could contain.[69]

---

[66] ECF No. 152 at 19.

[67] *Id.* at 21, 26–27.

[68] *Id.* at 2, 4, 6.

[69] Rock Fuel insists that it took steps to design the VSports Live concept, including hiring or reaching out to intellectual-property lawyers, technologists, and consultants with relevant experience and identifying "third-party technology providers [that] it planned to approach once Resorts World ultimately approved the project."  ECF No. 152 at 22–23.  But it acknowledges that, apart from the compliance-model document, Rock Fuel did not take any concrete steps to create functional software that did any of the things Rock Fuel envisioned in its presentation.

The court is thus left unable to articulate what Rock Fuel's alleged trade secret is.  Is it a product with the eight specific functionalities that Rock Fuel lists as its trade secret in its counterclaim?  Is it the shape-shifting "single, centralized system" meant to "seamlessly integrate" any and all functions that Resorts World might choose?  The fact that these questions cannot be answered with any certainty leads to the inescapable conclusion that Rock Fuel has not identified—and cannot identify—a protectable trade secret despite more than four years of litigation.

        b.        *Most of the elements of Rock Fuel's alleged trade secret were known in the industry and contemplated by Resorts World before the 2018 presentation, and Rock Fuel hasn't demonstrated that its combination isn't readily ascertainable.*

Even if I were to assume that Rock Fuel seeks to protect only the eight-element combination of app features it pled in its counterclaim, Resorts World has also met its summary-judgment burden to show that the combination was readily ascertainable to the public or those in the casino-technology industry.  Resorts World first points to several products in development and circulation before 2018 that integrated many of Rock Fuel's alleged trade-secret elements.  It notes that years earlier, in 2013, Sightline Payments introduced Sightline Play+, which allowed players to move money into a cashless wallet from various financial institutions, then cash out their winnings via app back to their banks.[70]  That product also allowed players to use the

---

[70] ECF No. 133-26 at 3 (21:6–22:4) (depo. of Mandi Hart, Sightline Payments LLC's FRCP 30(b)(6) witness).  The product was first rolled out in New Jersey casinos in 2013, and some functionality was introduced to Stations Casinos in Nevada in 2014.  *Id.* at 5 (31:25–32:17); 7 (40:13–21).  But full cashless functionality wasn't permitted by Nevada regulations at that time, though it was reported that the Nevada Gaming Control Board was actively discussing regulatory changes to permit wagering accounts that could be used on the casino floor as early as 2016.  *See* ECF No. 133-27 (Richard N. Velotta, *Gaming Control Board studying wagering accounts for gambling at slots, table games*, L.V. Rev. J. (Aug. 11, 2016)).

cashless wallet to fund gaming on the casino floor and to pay for non-gaming purchases on the same property.[71]

Resorts World also highlights that by 2017 IGT was offering a product called "Cardless Connect," which allowed players to connect a loyalty card to their phone and use the phone to pay for slot-machine gaming.[72] It was publicly announced that Resorts World implemented Cardless Connect in its Catskills Resort and Casino in late 2017.[73]

Resorts World has also shown that by early 2018, casino resorts were incorporating mobile sports betting. IGT was advertising its product called "PlaySpot" in January 2018 as a "mobile solution [that] gives players the option to wager on live roulette, baccarat games, keno, sports, and more from their mobile devices" from inside a casino.[74] PlaySpot "integrates" with other IGT products like Cardless Connect.[75] And Resorts World has also shown that William Hill advertised a sports-betting app that verified a user's identification and location and allowed the user to fund a betting account with a "William Hill Priority Access Card" back in March 2018, months before Rock Fuel's presentation.[76]

---

[71] ECF No. 133-26 at 6 (36:9–22).

[72] ECF No. 135-2 (transcript of 2017 IGT Cardless Connect advertisement, stating that "using the app, players tap their phone on the card reader on the slot machine, allowing them to card-in and load funds seamlessly" without the need for "cards, cash, or . . . tickets when moving from one game to another").

[73] *See* ECF No. 135-14 (IGT Press Release, *IGT Casino Management Systems with Cardless Connect, Mobile Applications and Gaming Machines Selected for Resorts World Catskills* (Oct. 11, 2017)).

[74] ECF No. 135-3 at 4 (Robert Simmons, *IGT announces ICE 2018 product line-up*, Gambling Insider (Jan. 30, 2018)).

[75] *Id.*

[76] ECF No. 135-10 (William Hill video transcript); ECF No. 135-9 (William Hill video, dated March 6, 2018, filed manually).

Finally, the record establishes that Resorts World was familiar with IGT Advantage. In a June 2019 advertisement from IGT—after Rock Fuel's presentation to Rock Fuel but before Resorts World contracted with IGT or JoinGo—described IGT Advantage as an integrated app that includes loyalty-card integration, a cashless wallet for gambling and on-site purchases, the ability to get prizes and comps via the app, and online sports betting.[77]

Resorts World has also shown that its own employees envisioned an integrated experience that included most of the components found in VSports Live as early as 2016.

---

[77] ECF No. 40 (transcript of "The IGT Advantage Player Experience" video).

[78] ECF No. 139-4 at 22                      .

[79] *Id.* at 55                      .

[80] ECF No. 139-5
                      .

It is axiomatic that "[i]f the subject matter of a trade secret is obvious and not a secret, then there can be no trade secret."[81]  Nevada's definition of a trade secret requires that it derives independent economic value "from not being generally known to, and not being readily ascertainable by proper means" by the public or persons who may derive commercial benefit from it.[82]  Rock Fuel acknowledges that each of its trade secret's individual elements was publicly known but insists that its combination of those elements didn't exist in any one product before its 2018 presentation.  Rock Fuel appears to argue that Resorts World bears the burden of "identif[ying] [a] public product that offered V-Sports's integrated feature set at the time of Rock Fuel's presentation."[83]  But it is Rock Fuel's burden to prove that its combination was a trade secret, which includes showing that its economic value is derived from not being generally known *and* not readily ascertainable.[84]

---

[81] *Hutchison v. KFC Corp.*, 883 F. Supp. 517, 521 (D. Nev. 1993) (citing *Self Directed Placement Corp. v. Control Data Corp*, 908 F.2d 462, 465 (9th Cir. 1990)).

[82] Nev. Rev. Stat. § 600A.030(5).

[83] ECF No. 152 at 20.

[84] Nev. Rev. Stat. § 600A.300(5); *Fortunet*, 554 P.3d at *5 (upholding district court's grant of summary judgment to defendants because plaintiff did not show that the purported trade secret's value "is derived from not being generally known to, and not being readily ascertainable by proper means by the public" (cleaned up)). In this one relevant respect, California and Nevada trade-secret law appears to differ.  California did not include the "readily ascertainable" language in its definition of a trade secret, instead treating it as an affirmative defense.  *See* Cal. Civ. Code § 3426.1(d) (defining trade secret as information that "derives independent economic value . . . from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use"); *Imax Corp v. Cinema Techs., Inc.*, 152 F.3d 1161, 1168 (9th Cir. 1998) (noting that "whether information is 'readily ascertainable is not part of the definition of a trade secret in California'" but that it is "available as a defense . . . 'based upon an absence of misappropriation, rather than the absence of a trade secret.'" (quoting *ABBA Rubber Co. v. Seaquist*, 235 Cal. App. 3d 1, 21 (1991)).  Because Nevada's trade-secret definition does include the readily ascertainable language, I predict that Nevada courts would place the burden on plaintiffs to show that an alleged trade secret is not readily ascertainable, instead of requiring the defendant to show that it is.  But even if the burden rests with Resorts World, I find that it has shown without genuine dispute that Rock Fuel's combination of elements was readily ascertainable.

Rock Fuel offers no evidence that the combination of these eight common elements represented some novel approach that wouldn't be obvious to those in the business of creating mobile technology solutions for casino-resort properties. Martin's report states only that he could not find a public product already in existence that combined the eight cherry-picked elements from Rock Fuel's multifaceted presentation. So, essentially, the idea Rock Fuel presented was to contain all of these publicly known ideas that were being implemented in casinos across the country into one system. In light of Resorts World's evidence showing that various casino-technology companies were actively developing products that involved combining available technologies like those Rock Fuel sought to, and without any evidence to show that some specific aspect of Rock Fuel's combination wasn't readily ascertainable to those companies, I cannot conclude that this combination wasn't readily ascertainable.[85]

### 2. Rock Fuel hasn't presented any competent evidence to show that Resorts World misappropriated its trade secret.

Even if I were to find a genuine issue of fact concerning whether the eight-element combination alleged in Rock Fuel's counterclaim is a trade secret, Resorts World has met its burden to show that the misappropriation element of the trade-secret claim isn't supported by competent evidence. It demonstrates first that Resorts World's app—at the time of its release—didn't include all eight of the elements in Rock Fuel's combination. It also notes that Resorts World didn't develop its own apps, and Rock Fuel has no evidence to suggest that Resorts World

---

[85] Because my findings that Rock Fuel's trade secret isn't sufficiently defined and that there is no genuine dispute of material fact about whether it was readily ascertainable are fatal to Rock Fuel's success on the first element of its trade-secret claim, I need not and do not address Resorts World's additional arguments that Rock Fuel's trade secret is a general concept that cannot be protected or that Rock Fuel extinguished its trade-secret claim while it filed for copyright registration in August 2021.

22

communicated Rock Fuel's ideas to its third-party vendors. Rock Fuel responds that misappropriation is often proven by circumstantial evidence that the products are similar and that the misappropriating party had access to the trade-secret information, a showing that it claims it has made through Martin's opinions. Rock Fuel also argues that it does not need to show that Resorts World used all the elements of its trade-secret combination to satisfy the misappropriation element.

> **a.      Rock Fuel's expert opinion on misappropriation would not assist the finder of fact, so it's excluded.**

Rock Fuel relies on Martin's opinion to contend that the similarities between Rock Fuel's eight elements and Resorts World's apps at launch are sufficient circumstantial evidence from which a jury could conclude that Resorts World used Rock Fuel's presentation materials to create its mobile products.[86] Resorts World moves to exclude that opinion evidence, arguing that Martin lacks the qualifications to opine on the similarities of mobile applications and that the opinion he gave, which was based solely on comparing the presentation materials with a review of the consumer-facing features of Resorts World's apps, is not founded on specialized expertise that would be helpful to a jury.[87]

Federal Rule of Evidence 702, as construed in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, imposes a "gatekeeping role" on the court in assessing whether to admit expert testimony.[88] The *Daubert* gate opens if the expert is qualified and the "expert's testimony both rests on a

---

[86] *See* ECF No. 152 at 27–28.

[87] ECF No. 128.

[88] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

reliable foundation and is relevant to the task at hand."[89]  A witness can be "sufficiently qualified as an expert by knowledge, skill, experience, training, or education," and the testimony is relevant if the "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."[90]  The testimony is reliable if it is "based on sufficient facts or data" and "the product of reliable principles and methods" and "the expert has reliably applied the relevant principles and methods to the facts of the case."[91]  When an expert "offers non-scientific testimony, 'reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind' the testimony."[92]

Martin is an intellectual-property lawyer.  Rock Fuel has not established that he has specialized expertise or knowledge in app development, casino- or hotel-management software, sports-gaming software, or any other field that would give him the specialized knowledge to compare app functionalities.[93]  He merely downloaded the Resorts World apps, compared what he saw to the 2018 presentation materials, and concluded that they have some overlap.[94]  He did not review source code, inquire into whether Resort World integrated the features in a manner that was similar to Rock Fuel's concept, or review any records related to how the Resorts World apps were developed by JoinGo or IGT.  Rock Fuel has not shown that Martin has any

---

[89] *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (citing *Daubert*, 509 U.S. at 597).

[90] *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014) (citing Fed. R. Evid. 702).

[91] *Id.* (citing Fed. R. Evid. 702).

[92] *Porter v. Martinez*, 68 F.4th 429, 444 (9th Cir. 2023) (quoting *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004)).

[93] ECF No. 130-3 at 2–3 (Martin's preliminary report, describing his professional background as an intellectual-property attorney).

[94] *See generally id.*

qualifications to evaluate whether the concepts introduced by Rock Fuel were in fact integrated into Resorts World's apps in the way that Rock Fuel contends was protected.

Even if Martin's qualifications sufficed, his opinions are excludable because they do not rely on any specialized knowledge or expertise. He merely reviewed Resorts World's products, compared them to the combination of elements he identified as Rock Fuel's trade secret, and concluded that Resorts World "has a system that looks a lot like" Rock Fuel's concept.[95] Any layperson can compare screenshots, and Rock Fuel fails to show that Martin has relevant experience that gives him specialized insight into this comparative endeavor.

Rock Fuel points out that experts are generally allowed to opine on whether a product has been misappropriated.[96] The main case it relies on, *Comet Technologies USA Inc. v. XP Power LLC*, allowed testimony from a technical expert with "broad experience" in the technologies that were alleged to be a trade secret, noting that the "appropriate mechanism to challenge" testimony on the grounds that it "constitutes a legal conclusion" is through vigorous cross-examination.[97]

The difference here is the degree of relevance and reliability of the expert. Neither *Comet Technologies* nor any of the other cases Rock Fuel relies on appears to allow the testimony of an attorney with no specialized experience in the type of product that is alleged to have been misappropriated.[98] They instead permit testimony of undisputedly qualified experts,

---

[95] ECF No. 130-2 at 17 (160:15–18).

[96] *See* ECF No. 148 at 20.

[97] *Comet Techs. USA Inc. v. XP Power LLC*, 2022 WL 2442810, at *3 (N.D. Cal. Mar. 2, 2022).

[98] *See Copart, Inc. v. Sparta Consulting, Inc.*, 2018 WL 1871414, at *14 (E.D. Cal. Apr. 19, 2018) (denying without analysis a motion to exclude expert without prejudice to the party's ability to renew its challenge at trial); *OTR Wheel Eng'g Inc. v. W. Worldwide Servs., Inc.*, 2016 WL 3626383, at *3–4 (E.D. Wash. Jan. 20, 2016) (permitting expert testimony without identifying the expert's experience or qualifications); *Xtec, Inc. v. Cardsmart Techs., Inc.*, 2014 WL 10268426, at *11 (S.D. Fla. May 15, 2014) (permitting expert testimony analyzing source code).

ruling that the jury gets to decide whether their opinions were convincing. But Martin lacks specialized experience that would permit him to glean anything more than a layperson could. So his opinion on whether Resorts World misappropriated Rock Fuel's trade secret is not admissible. I thus do not consider Martin's opinions when analyzing whether there is a genuine dispute of material fact on the misappropriation element.

> **b.     *Rock Fuel hasn't shown that Resorts World's apps contained all of the elements in its trade-secret combination.***

Resorts World contends that because Rock Fuel cannot produce evidence showing that its apps implemented every element of Rock Fuel's trade secret, it cannot establish that Resorts World misappropriated it. Rock Fuel responds that "courts in this jurisdiction have flatly rejected the requirement" that every element must be used to misappropriate a combination trade secret.[99] Rock Fuel relies on one nonbinding case from the District of Oregon to make its argument. In *Opal Labs Inc. v. Sprinklr, Inc.*, the defendant accessed the plaintiff's content-management software and continued accessing it while developing a competing product.[100] The court rejected the defendant's argument that the plaintiff must "demonstrate that [d]efendant's product uses or incorporates each of the elements of [p]laintiff's trade secret," noting that "information may be improperly 'used' in that it is unlawfully acquired and then built upon or modified before being disclosed or benefit derived."[101]

*Opal Labs* is inapposite, so I find it unpersuasive. That case dealt with existing software that the defendant accessed while designing a product that it dubbed a "full replacement" of the

---

[99] ECF No. 152 at 25.

[100] *Opal Labs Inc. v. Sprinklr, Inc.*, 2021 WL 3713042, at *4 (D. Or. Aug. 19, 2021).

[101] *Id.* (quoting *SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176, 1197 (S.D. Cal. 2012)).

plaintiff's product.[102]  There was no allegation that the individual elements of that combination trade secret were publicly known.  But here, Rock Fuel alleges that the secret part of its product is the unique combination of eight publicly known functionalities into a single system.  So the notion Resorts World used only some of those publicly known elements is inconsistent with Rock Fuel's claim that its protectable trade secret lies in its "unique combination" of all these elements.[103]  In a case in which no element is individually protectable, it only makes sense to require specificity in what a plaintiff claims as its protectable combination—and to find misappropriation only when all of those elements are used.

The Southern District of New York's opinion in *Sarkissian Mason, Inc. v. Enterprise Holdings*, on which Resorts World relies, is far more persuasive here.[104]  In *Sarkissian Mason*, rental-car company Enterprise Holdings was negotiating with digital-marketing company Sarkissian to design a program that would encourage renters to buy the type of car they were renting.[105]  Sarkissian presented to Enterprise its concept, which included a list of features, like a QR code that would direct renters to marketing materials designed to persuade them to buy the

---

[102] *Id.* at *2.

[103] *See* ECF No. 152 at 4.

[104] *Sarkissian Mason, Inc. v. Enter. Holdings*, 955 F. Supp. 2d 247 (S.D.N.Y. 2013).  Rock Fuel doesn't address *Sarkissian Mason* except to argue that Resorts World relies on out-of-circuit opinions and thus that those cases are unpersuasive.  But Rock Fuel's trade-secret claim is based on Nevada law, and most of the cases that both parties cite do not interpret Nevada law.  In the absence of a Nevada Supreme Court case on the subject or a Ninth Circuit case interpreting Nevada law, the law cited by the parties is nonbinding and persuasive at best.  I thus consider the opinions of out-of-circuit courts that are interpreting the same Uniform Trade Secrets Act that Nevada has adopted, and I find that *Sarkissian Mason* is persuasive because, while it comes from a different circuit, it applies a similar state law in a manner that I believe Nevada courts would also find persuasive.

[105] *Id.* at 250–52.

same car.[106]  The parties couldn't agree on one component of the product, and eventually Enterprise rolled out its own that would allow renters to scan a QR code in the rental car that would take them to a webpage with information about the car and direct them to dealerships in their area.[107]  Sarkissian sued for trade-secret misappropriation.

Applying Missouri's Uniform Trade Secrets Act, the court granted summary judgment in Enterprise's favor, holding in part that Sarkissian did not raise a triable issue of fact concerning whether Enterprise misappropriated any trade secrets.[108]  Like here, the trade secret Sarkissian advanced was made up of only publicly known elements.  The court reasoned that, because two of those publicly known elements were not contained in Enterprise's products, Sarkissian could not show that its unique combination of elements was misappropriated.  Instead, the products were "different concepts created from a similar collection of publicly available ideas concerning the use of mobile devices to connect consumers to information about products they are using or considering purchasing."[109]

The same is true here.  Rock Fuel's concept was a coming-together of known features for casino and gaming apps, but Resorts World's apps lacked several of those elements.  They did not verify user identity or allow players to set up cashless wagering accounts without first visiting a kiosk at the casino (element #1).[110]  The wagering account available through the app

---

[106] *Id.*

[107] *Id.* at 258.

[108] The court also held that the concept presentation Sarkissian gave Enterprise did not contain a trade secret.  The Second Circuit affirmed that finding, reasoning that "[e]ven if plaintiffs' marketing proposal combining these idea[s] was novel, it is not a trade secret because it is (and was) easily replicated."  *Sarksissan Mason, Inc. v. Enterprise Holdings, Inc.*, 572 F. App'x 19, 22 (2d. Cir. 2014).

[109] *Sarkissian*, 955 F. Supp. 2d at 258–59.

[110] As Resorts World's former vice president of casino operations Richard Hutchins explains in his declaration, this changed in 2022 when the Nevada Gaming Control Board amended its

28

was a pre-paid debit account that could be funded through other financial institutions, but it couldn't be used for point-of-sale purchases from the Resorts World app—it was available only for gaming (elements #2 & #4).[111]  The account, which was essentially its own debit account managed by Sightline, could be attached to a user's personal digital wallet through another app (like Apple Pay) and used for point-of-sale purchases, but none of that happened in Resorts World's app.[112]  And players couldn't cash out without visiting the cashier's cage (element #7).[113]

Nor did the apps allow for betting on "skill-based video games," esports, or fantasy sports (element #3).[114]  And the sports betting app wasn't integrated with Resorts World's loyalty program—a customer needed a loyalty number to log in, but the app didn't allow players to receive loyalty points for their sports-betting activity (element #5).[115]  Nor were there any social aspects—like a leaderboard or the ability to message other players—in either app (element #8).[116]  Resorts World's apps also contained a host of functionalities that were never envisioned as part of Rock Fuel's integrated concept, like integration with the onsite hotels and the ability to make dining reservations.

---

regulations to allow remote enrollment for casino games—JoinGo rolled out this feature once it was legal to do so.  ECF No. 133-2 at 3–4, ¶¶ 16–17, 22–23.  Rock Fuel has not suggested or shown that JoinGo's 2022 changes were a result of its 2018 presentation.

[111] ECF No. 133-2 at ¶¶ 19–20.

[112] *Id.* at ¶ 29.

[113] *Id.* at ¶ 36.

[114] *Id.* at ¶¶ 26–27.

[115] *Id.* at ¶ 32.

[116] *Id.* at ¶ 39.

With this many crucial differences between Rock Fuel's trade-secret elements and the product Resorts World rolled out, I cannot conclude that the products are similar enough to support the inference that Resorts World misappropriated Rock Fuel's concept.  Kentucky Fried Chicken's famous original recipe combines 11 herbs and spices.  Individually, those ingredients are common, but it's the unique combination of them that makes the recipe a trade secret.  If a competitor created a spice combination that contained five spices that also happened to be in KFC's recipe, no reasonable person could accuse the competitor of misappropriating KFC's proprietary blend.  Rock Fuel's claimed secret sauce is an eight-ingredient blend that is not misappropriated by Resorts World's use of some of the same app ingredients and many others.[117]

          *c.*      *Rock Fuel's reliance on circumstantial evidence that Resorts World employees retained its presentation materials isn't sufficient to create a genuine dispute of fact concerning misappropriation.*

Rock Fuel's final argument relies on the purported power of circumstantial evidence.  It emphasizes that the "misappropriation of trade secrets is often proven through circumstantial evidence," citing district court cases acknowledging that misappropriation is difficult to prove.[118]

---

[117] The same holds true if the trade secret is instead a seamlessly integrated, centralized system that contained VSports Live's "core components."  ECF No. 152 at 27.  Rock Fuel presents no competent evidence that Resorts World used a cohesive, centralized platform of the type that Rock Fuel envisioned.   It offers no dissection of the manner in which Resorts World's mobile functionalities work together—at best, it presents news articles and press releases in which Resorts World touts its app as the first on the Las Vegas Strip to offer cashless wagering accounts tied to a player's loyalty card and integrations with RFID embedded chips to track bets.  *See* ECF No.152-2 at 178–87 (*Resorts World Las Vegas Unveils Unparalled Gaming Experience When the Resort Opens June 24*, Resorts World (June 16, 2021)); 189–94 (Howard Stutz, *Resorts World extends cashless wagering to table games: 'We're doing things that the city has never seen,'* The Nev. Indep. (June 18, 2021)); 197–200 (*Genting's Resorts World Las Vegas to offer fully cashless gaming experience*, asgam.com (June 18, 2021)).  But what those clippings fail to show is that the "integrated" technology Resorts World employed is similar to the concept that Rock Fuel proposed in its presentation materials.

[118] ECF No. 152 at 24 (citing *BGC Partners, Inc. v. Avison Young, Inc.*, 2024 WL 1381414, at *11 (D. Nev. Mar. 31, 2024); *Replenium Inc. v. Albertsons Cos., Inc.*, 2025 WL 460057, at *10 (W.D. Wash. Feb. 11, 2025)).

In *Replenium Inc. v. Alberstons Companies, Inc.*, for example, the Western District of Washington acknowledged that in most misappropriation cases the "plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences . . . that it is more probable than not that what the plaintiffs allege happened did in fact take place."[119]

Rock Fuel argues that it has sufficient circumstantial evidence to get the misappropriation question to a jury, highlighting the undisputed facts that "Resorts World had full access to Rock Fuel's [VSports Live] materials" and that Resorts World retained those materials throughout the period during which JoinGo and IGT were developing Resorts World's apps.[120]  It also points to the fact that "key Resorts World [employees] attended the Rock Fuel proposal."[121]  Rock Fuel contends that those facts, combined with its belief that Resorts World's products are "similar" to Rock Fuel's trade secret, constitute sufficient circumstantial evidence from which a jury could infer that Resorts World had access to the trade secret and used it.[122]

Unfortunately for Rock Fuel, this showing is woefully inadequate.  It stresses that Resorts World had access to the Rock Fuel presentation materials but fails to tie any of the people with access or the people at the presentation to Resorts World's collaboration with JoinGo or IGT.  It presents no evidence that anyone at Resorts World communicated with JoinGo or IGT about Rock Fuel, or that Resorts World drafted its requests for proposal with help from, reference to, or reliance on the Rock Fuel materials.

---

[119] *Replenium Inc.*, 2025 WL 460057, at *10 (quoting *Monovis Inc. v. Aquino*, 905 F. Supp. 1205, 1231 (W.D.N.Y. 1994)).

[120] ECF No. 152 at 25.

[121] *Id.*

[122] *Id.*

Indeed, the record evidence supports only inferences that undermine Rock Fuel's theories. In a response to Rock Fuel's interrogatories, Resorts World averred that "Resorts World personnel did not consult the VSports Live presentation or materials when working with JoinGo to create" its app.[123] Resorts World's vice president of casino operations, who oversaw the decisions related to these apps, averred that he "had never heard of VSports Live or Rock Fuel Media" and had "no reason to believe that anyone involved with the selection or implementation of the apps in use by Resorts World relied in any way upon Rock Fuel's materials."[124] ██████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████[125] Rock Fuel also doesn't present any evidence from which one could infer that any of the individuals involved in implementing the JoinGo and IGT apps were the same people who went to Rock Fuel's presentation or had access to its materials.[126]

In short, the undisputed evidence that some Resorts World employees had access to Rock Fuel's materials, without more, does not permit a reasonable jury to infer that Resorts World misappropriated its trade secrets. That's especially true when combined with the fact that the

---

[123] ECF No. 137-1 at 4.

[124] ECF No. 133-2 at 3–4, ¶¶ 5–6, 11.

[125] See ECF Nos. 139-6, 140-4.

[126] Indeed, it appears that the people involved, with one exception, don't overlap at all. Rock Fuel asserts that Myers, Edward Farrell, Gerald Gardner, Aviv Laurence, Doni Taube, and Paul Gunderson attended the 2018 meeting. ECF No. 152 at 7–8. ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████ And Gardner testified that he had virtually no memory of the presentation, stayed for only 10-15 minutes to "stop in and say hi to the gentlemen, introduce myself, and leave," and had no recollection of the materials that were handed out. ECF No. 133-12 at 3 (8:5–9:12).

company's products aren't similar, as discussed above and because the weight of the evidence suggesting that Resorts World independently developed its applications years later by contracting with third parties that did not have access to Rock Fuel's materials. So I grant Resorts World's motion for summary judgment on Rock Fuel's trade-secret counterclaim.

**B.        Rock Fuel's breach-of-contract counterclaim fails.**

Rock Fuel also claims that Resorts World breached the parties' NDA when it used Rock Fuel's trade-secret materials. To prove breach, Rock Fuel must show "(1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach."[127]  The parties do not dispute that the NDA is a valid and binding contract, and Resorts World moves for summary judgment on this claim, arguing that Rock Fuel has not produced any evidence of breach.

*1.        Rock Fuel has presented no evidence to show that Resorts World used or disclosed its confidential information.*

The NDA prohibits either party from ████████████████████ ████████████████████████████████████ ██████████████████████████ ████████[128]  Rock Fuel's theory is largely coextensive with its trade-secret claim; it alleges that Resorts World breached the NDA's non-disclosure provision by "continuing to utilize or otherwise appropriate [Rock Fuel's] Proposals or any other information falling within the provisions of the NDA, such as VSports Live."[129]  Resorts World contends that Rock Fuel's

---

[127] *Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 899 (9th Cir. 2013) (quoting *Saini v. Int'l Game Tech.*, 434 F.Supp.2d 913, 919–20 (D. Nev. 2006)).

[128] ECF No. 133-9 at 3 ████████████████.

[129] ECF No. 11 at 12, ¶ 75.

trade-secret combination does not constitute "confidential information" under the NDA and, even if it did, Rock Fuel has no evidence that Resorts World used that information. I assume without deciding that the information falls under the NDA's "confidential information" definition, but I conclude that Rock Fuel has failed to present evidence of disclosure or use.

As it did with the trade-secrets claim, Resorts World has shown that no evidence suggests that the information conveyed during the 2018 presentation was used by Resorts World. Only some of the app elements overlap with Resorts World's final products, and Rock Fuel has identified no evidence that Resorts World referred to Rock Fuel's materials when working with JoinGo and IGT to develop or implement them, that any of those materials were discussed with or given to JoinGo and IGT, that the same people who heard the Rock Fuel presentation were the folks who collaborated with JoinGo or IGT, or that those specific people even had access to Rock Fuel's presentation materials. So I cannot conclude on this record that a reasonable jury could find that Resorts World used or disclosed Rock Fuel's confidential information.

> **2.      *Rock Fuel's failure-to-destroy theory is new and cannot be relied upon at this late stage of litigation.***

In its response to Resorts World's summary-judgment motion, Rock Fuel adds a new NDA-breach theory—that Resorts World breached a different NDA provision, which required the return of confidential materials. That provision says that, ███████████ ████████████████████████████████████████████████ ████████████████████ [the] receiving party shall . . . immediately (and in any event no later than 7 days from completion, termination[,] or request . . .) return to disclosing party or destroy, in a manner directed by disclosing party, all confidential information, and all copies

thereof . . . ."[130]  Rock Fuel points to evidence suggesting that Resorts World retained its presentation materials well beyond the termination of the parties' business relationship.  But Rock Fuel does not mention this provision anywhere in its counterclaim.  Resorts World contends in reply that Rock Fuel is improperly attempting to add this new breach theory at the summary-judgment stage and should not be permitted to do so.[131]

The Ninth Circuit frowns on such sandbagging.  It has noted that "[a]fter having focused on one theory in [its] complaint and during discovery, [a claimant] cannot turn around and surprise the defendant at the summary judgment stage with a completely different theory."[132]  Rock Fuel became aware that Resorts World kept its presentation materials by at least September 2022, when Resorts World produced those materials in discovery.  But it does not appear that Rock Fuel alerted Resorts World to the fact that it would pursue a breach theory based on its retention of those materials, such that Resorts World could conduct discovery into the basis of those allegations.  I conclude that it would unjustly prejudice Resorts World to allow Rock Fuel to raise a previously unpled breach theory at this late stage in litigation, so I do not consider it further.

**C.    Rock Fuel's unjust-enrichment claim is preempted by NUTSA.**

Rock Fuel's final counterclaim alleges that Resorts World has been unjustly enriched by the "benefit of the content set forth" in its presentation materials.[133]  Resorts World contends that

---

[130] *Id.* at 4.  I do not redact some of this language because Rock Fuel quoted it verbatim in a publicly available filing.  *See* ECF No. 152 at 9.

[131] ECF No. 158 at 27–28.

[132] *Hartzell v. Marana Unified Sch. Dist.*, 130 F.4th 722, 744 (9th Cir. 2025) (cleaned up).

[133] ECF No. 11 at 14, ¶ 88–92.

35

this claim is preempted by NUTSA, it cannot exist alongside a breach-of-contract claim, and it substantively fails.[134]

NRS 600A.090 of NUTSA provides that 'this chapter displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret."[135]  In *Frantz v. Johnson*, the Nevada Supreme Court noted that NUTSA would preclude claims for unjust enrichment and unfair competition if they are "duplicative of plaintiff's claim for misappropriation of trade secrets."[136]  It explained that NUTSA does not provide "a blanket preemption to all claims that arise from a factual circumstance involving a trade secret," but when the factual circumstances underlying the claim are "completely dependent on the facts concerning misappropriation of trade secrets," such an unjust-enrichment claim is barred by NUTSA.[137]

Rock Fuel doesn't deny that its unjust-enrichment claim relies on the same set of facts as its misappropriation claim.  It merely contends that it should be able to proceed with this claim because it might otherwise be left without a remedy.[138]  But NUTSA clearly preempts claims that provide civil remedies for misappropriation—something that Rock Fuel is explicitly trying to use its unjust-enrichment claim to do.  So this claim is preempted by NUTSA.[139]  I thus grant Resorts World summary judgment on this final counterclaim, too.

---

[134] ECF No. 132 at 44–45.

[135] Nev. Rev. Stat. 600A.090(1).

[136] *Frantz*, 999 P.2d at 357 (citing with approval *Hutchison*, 809 F. Supp. at 70, which held that those claims were preempted).

[137] *Id.* at 357 n.3.

[138] ECF No. 152 at 30.

[139] Even if it wasn't, I would grant summary judgment on this claim because Rock Fuel has not shown a genuine dispute of material fact over whether Resorts World used, accepted, or retained any benefit from Rock Fuel's materials.

**Conclusion**

IT IS THEREFORE ORDERED that Resorts World's motion to exclude James Martin's expert testimony **[ECF No. 128] is GRANTED in part** as explained in this order.

IT IS FURTHER ORDERED that Resorts World's motion for summary judgment on Rock Fuel's counterclaims **[ECF No. 132] is GRANTED**.  Resorts World is entitled to judgment in its favor on all of Rock Fuel's counterclaims.

But because Resorts World's declaratory-relief claims technically remain and the parties agreed to a bifurcated discovery schedule,[140] I do not enter final judgment at this time.  **The parties must file a joint status report explaining what is left to do in this case by March 30, 2026**.  If the parties dispute what remains, any such dispute should be described in the report. Any obligation to file a joint pretrial order remains stayed pending further order of the court.

_____
U.S. District Judge Jennifer A. Dorsey
March 12, 2026

---

[140] *See* ECF Nos. 125, 143.

37